**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| GREGORY BOSTARD,<br><br>Plaintiff,<br><br>v.<br><br>BOROUGH OF WILDWOOD CREST, *et al.*,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 1:23-cv-18574-KMW-MJS<br><br>**OPINION** |

APPEARANCES:

**Michael K. McFadden, Esq.**
Law Offices of Michael K. McFadden LLC
1201 New Road
Suite 309
Linwood, NJ 08221

*Counsel for Plaintiff*

**A. Michael Barker, Esq.**
**Greg Paul Dilorenzo, Esq.**
Barker, Gelfand & James, P.C.
210 New Road, Suite 12
Linwood, NJ 08221

*Counsel for Defendants*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

This civil-rights action arises from the September 11, 2021, arrest of Plaintiff Gregory Bostard ("Plaintiff") on a Wildwood Crest beach. (Amended Complaint ("Am. Compl."), Dkt. No. 33.) Plaintiff contends that the individual officers used excessive force or failed to intervene and that the Borough of Wildwood Crest maintained an unconstitutional policy or custom. Defendants Wildwood Crest Boro, Detective James Collins, Captain Richard D'Amico, Jr., and Officer Raymond Engel (collectively, "Defendants") move for summary judgment on all claims. (Dkt. No. 45). Plaintiff opposes and cross-moves for summary judgment on his excessive-force and failure-to-intervene claims. (Dkt. No. 53.)

The encounter giving rise to Plaintiff's claims was recorded from several body-worn cameras. Those recordings show that officers repeatedly told Plaintiff he was detained, that Plaintiff continued to walk away after being told he was not free to leave, and that officers announced his arrest before taking him to the ground. They also show Plaintiff actively resisting the officers' sustained efforts to control and handcuff him. Because no reasonable jury viewing that record could find the challenged force objectively unreasonable, and because Plaintiff identifies no triable basis for derivative or municipal liability, Defendants' motion will be **GRANTED** and Plaintiff's cross-motion will be **DENIED**.

## II. BACKGROUND

### A. The Investigation and Detention

At approximately 7:00 p.m. on September 11, 2021, Wildwood Crest Police Dispatch received a 911 report of suspected child abuse on the beach. The caller reported that a woman asked her to call police because a man had struck one child and choked another and described the group and their location. (Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 1, Dkt. No. 45-3; *see* Pl.'s Response to SUMF ("RUMF") ¶ 1, Dkt. No. 47-4.)

Special Officer Bryan Garrett arrived first and located a group matching the report. Garrett told Plaintiff that someone had reported possible child abuse and asked what happened. Plaintiff denied striking a child. (SUMF ¶¶ 2–6; Pl.'s Opp., Ex. 2, Garrett Body-Worn Camera Recording ("BWC") at 1:06–1:36, Dkt. No. 49.) Officer Raymond Engel then arrived. Plaintiff asked whether he could leave, and Engel responded that Plaintiff was being detained while officers investigated. Plaintiff replied, "Are you kidding me?" Engel explained that officers wanted to ask him some questions. (Defs.' SUMF ¶¶ 7–9; Garret BWC at 1:45–2:04.)

The officers separated the witnesses. Garrett and Captain Richard D'Amico spoke with Plaintiff's companion, Lori Zamicheili, and the two juveniles, J.K. and Z.J.; Engel remained with Plaintiff. (Defs.' SUMF ¶¶ 10–11, 24.) Detective Corporal James Collins arrived while those

interviews were underway. He observed one child with sand on his face and neck and the other crying. (*Id.* ¶¶ 12–13.) Zamicheili told Garrett and D'Amico that Plaintiff had "spazzed out," struck one child, and choked the other. (*Id.* ¶¶ 24–25; Garret BWC at 2:20–2:56.) Meanwhile, Engel asked Plaintiff for identification. Plaintiff stated he did not have it with him. After Plaintiff questioned why he needed identification, Collins again told him he was being detained while officers investigated the abuse report. Plaintiff asked, "Am I under arrest?" Collins answered that he was not then under arrest but was not free to leave. (Defs.' SUMF ¶¶ 14–17; Pl.'s Opp., Ex. 3, Engel BWC at 2:24–2:35, Dkt. No. 49-1.)

### B. <u>The Arrest and Use of Force</u>

Plaintiff nevertheless continued walking away. Collins followed, grasped Plaintiff's left arm, and stated, "You're under arrest now." Plaintiff pulled away and yelled, "No I'm not. I'm not under arrest!" Collins then brought Plaintiff to the sand, and Engel immediately assisted. (Defs.' SUMF ¶¶ 18–21; Engel BWC at 2:36–2:45.)

The ensuing struggle lasted approximately three minutes. Plaintiff kept his arms beneath or near his body, pushed upward from the sand, gripped the handcuffs at one point, and did not comply with repeated commands to place his hands behind his back and stop resisting. Collins and Engel used their body weight and hands to control Plaintiff's torso and arms. (Defs.' SUMF ¶¶ 22–23, 28–30; Engel BWC at 2:46–5:54.) D'Amico joined after learning from the witnesses that Plaintiff had struck and choked the children. He attempted to control Plaintiff's upper body and shoulder. Approximately twenty seconds later, D'Amico announced, "mace out, mace out," and briefly deployed oleoresin capsicum ("OC") spray toward Plaintiff's face. (Defs.' SUMF ¶¶ 24–27; Pl.'s Opp., Ex. 4, D'Amico BWC at 1:30–2:58, Dkt. No. 49-2.) Chief Robert Lloyd also assisted briefly after Plaintiff gripped the handcuffs and would not release them. (Defs.' SUMF ¶ 28; Ex. 5, Lloyd BWC at 0:58–1:18, Dkt. No. 49-3.)

The recordings do not depict any officer punching or kicking Plaintiff. Nor do they depict a chokehold or an officer applying sustained pressure to Plaintiff's neck. Although Plaintiff characterizes D'Amico's hand placement as choking and an officer's knee placement as pressure on his neck, the recordings clearly show D'Amico using his hands to control Plaintiff's upper body and an officer placing a knee on Plaintiff's shoulder—not his neck—while Plaintiff continued to resist. (D'Amico BWC at 2:31–3:40; Engel BWC at 3:24-6:07; *see* Defs.' SUMF ¶¶ 29–30.) Once officers secured both of Plaintiff's hands behind his back, the force ceased. (Engel BWC at 5:54-6:07.) After handcuffing Plaintiff, officers summoned emergency medical personnel. Plaintiff was transported to Cape Regional Medical Center and later alleged injuries including a ruptured biceps tendon. (Defs.' SUMF ¶ 31.) Defendants' orthopedic expert opines that the tendon rupture resulted from the force Plaintiff generated while resisting the officers' efforts to place his arms behind his back. (Report of Michael L. Anapolle, M.D. at 8–9, Dkt. No. 54-8.)

### C. <u>Procedural History</u>

Plaintiff asserts four claims: excessive force under 42 U.S.C. § 1983 against the individual Defendants (Count One); failure to intervene under § 1983 (Count Two); municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Wildwood Crest (Count Three); and parallel claims under the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2 (Count Four). (Am. Compl. ¶¶ 25-48.) Defendants moved for summary judgment. (Dkt. No. 45.) Plaintiff opposed and cross-moved for summary judgment on the excessive-force and failure-to-intervene claims. (Dkt. No. 53.) Defendants filed a reply. (Dkt. No. 54.)

## III. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and a fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). The moving party bears the initial burden of identifying the absence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmovant must identify specific record evidence from which a jury could find in its favor; speculation and conclusory assertions will not suffice. *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016).

Ordinarily, the Court views the evidence and draws reasonable inferences in the nonmovant's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But when a reliable video recording "blatantly contradict[s]" a party's account so that no reasonable jury could believe it, the Court must view the facts in the light depicted by the recording. *Id.* at 380; *Jacobs v. Cumberland County*, 8 F.4th 187, 192 (3d Cir. 2021). This rule does not permit a court to weigh ambiguous footage or resolve a genuine dispute merely because an incident was recorded. It does permit the Court to reject an account that clear audiovisual evidence conclusively disproves. *Jacobs*, 8 F.4th at 192.

That limitation matters here. The Court does not assume that every event captured on video is free from interpretation, nor does it resolve a factual dispute simply because Defendants' account appears more persuasive. Instead, the Court departs from Plaintiff's version only where the recordings clearly and objectively resolve the point. *See Jacobs*, 8 F.4th at 192. Any matter that the recordings do not conclusively establish is considered in the light most favorable to the party opposing the motion under review.

Local Civil Rule 56.1 likewise requires a party opposing summary judgment to furnish a responsive statement admitting or disputing each material fact and citing the record supporting any dispute. L. Civ. R. 56.1(a). Plaintiff's responsive statement often states only that he "agrees" or "disagrees" with a characterization, without identifying contrary evidence. (*See generally* Pl.'s RUMF, Dkt. No. 47-4.) To the extent a response fails to cite record evidence, the properly supported fact is deemed undisputed. L. Civ. R. 56.1(a). In all events, the Court has independently reviewed the cited materials, including the individual recordings underlying the combined video.

Plaintiff objects that the combined recording is not perfectly synchronized and that an automated caption omitted a word. (Pl.'s Opp. Br. at 38–39, Dkt. No. 53.) The Court relies on the recordings' images and audible dialogue—not the automated captions—and the minor timing differences do not create a material dispute about what occurred.

The recordings are sufficiently clear and comprehensive on the facts material to the motions. They capture the officers' statements that Plaintiff was detained and not free to leave; Plaintiff's continued movement away from Collins; Collins' announcement of the arrest; Plaintiff's response to the officers' efforts to control his arms; D'Amico's warning before deploying OC spray; the location and duration of the officers' upper-body contact; and the termination of force once the handcuffs were secured. The camera angles differ, but the recordings are mutually consistent on those events. Plaintiff's isolated still images do not contradict the moving sequence; they remove the immediately preceding and succeeding frames that reveal the officers' movements and Plaintiff's continuing resistance. Accordingly, the Court credits Plaintiff's version where the footage permits more than one reasonable interpretation, but it does not adopt assertions that the recordings squarely disprove. *See Scott*, 550 U.S. at 380.

Where, as here, both sides move for summary judgment, the Court applies the same standard to each motion and considers the evidence in the light most favorable to the party opposing the motion under review. *Auto-Owners Insurance Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016).

## IV. DISCUSSION

The Court first addresses the excessive-force claim against the individual officers, including their alternative assertion of qualified immunity. It then considers failure to intervene, municipal liability, and the parallel NJCRA claim.

### A. Excessive Force

#### 1. Governing Law

Section 1983 supplies a cause of action against a person who, acting under color of state law, deprives another of a federal right. 42 U.S.C. § 1983. A claim that officers used excessive force in making an arrest is governed by the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The inquiry is objective and asks whether the force was reasonable from the perspective of an officer on the scene, allowing for the fact that officers often must make split-second decisions in tense and rapidly evolving circumstances. *Id.* at 396–97. The officer's motive is irrelevant. *Id.* at 397.

Relevant circumstances include the severity of the suspected offense, whether the suspect posed an immediate threat, and whether he actively resisted arrest or attempted to flee. *Id.* at 396. The Court may also consider the encounter's duration, whether the suspect was armed, the number of persons involved, and whether the force caused injury. *Anglemeyer v. Ammons*, 92 F.4th 184, 188–89 (3d Cir. 2024). The assessment considers the totality of the circumstances and evaluates each challenged use of force at the moment it occurred. *See Barnes v. Felix*, 605 U.S. 73, 78–81 (2025); *Graham*, 490 U.S. at 396.

#### 2. The *Graham* Factors

Plaintiff challenges Collins' takedown; Collins' and Engel's efforts to control his arms; D'Amico's alleged chokehold, shoulder restraint, and two bursts of OC spray; Lloyd's assistance; and the force collectively used to complete handcuffing. (Pl.'s Opp. Br. at 11–19.) The Court first considers the circumstances bearing on all those acts and then evaluates each officer's conduct.

First, the suspected conduct was serious. The officers were not responding to a minor public-order offense. Dispatch reported that an adult had struck one child and choked another. At the outset, that report supplied an objectively reasonable basis to detain Plaintiff while officers separated and interviewed the witnesses. By the time D'Amico joined the struggle, Zamicheili and the children had corroborated the substance of the report. (Defs.' SUMF ¶¶ 1, 24–25; D'Amico

BWC at 1:03-2:34.) The information available to the officers therefore indicated recent violence against children, not merely an unsubstantiated disagreement on the beach.

Second, although Plaintiff displayed no weapon, the officers reasonably perceived a growing risk as the encounter unfolded. Plaintiff ignored repeated statements that he was detained, continued walking away after Collins told him he was not free to leave, and pulled away when Collins grasped his arm and announced the arrest. On the ground, Plaintiff kept his hands beyond the officers' control, pushed his upper body upward, and eventually obtained a grip on the handcuffs. (*Id.* at 2:43–4:46.) An unsecured hand—and especially control of the handcuffs—presented an immediate risk during a close physical struggle, even though no weapon had been seen.

Third, the footage shows active resistance, not merely hesitation or passive noncompliance. Before the arrest, Plaintiff attempted to leave the detention. At the moment of arrest, he pulled from Collins' grasp. After the takedown, he tensed his body, concealed or withdrew his arms, pushed against the sand, gripped the handcuffs, and failed to obey repeated commands to place his hands behind his back and stop resisting. (*Id.*) These actions materially distinguish this case from decisions involving force against a compliant, subdued, or already-handcuffed person.

Finally, the amount and progression of force corresponded to the resistance encountered. The officers began with verbal instructions. Collins used hands-on control only after Plaintiff continued walking away, and D'Amico used OC spray only after manual efforts had not secured both hands. No officer punched, kicked, struck Plaintiff with an object, used a baton, or deployed a Taser. The force was directed toward controlling Plaintiff's upper body and arms, and it ceased once the handcuffs were secured. The struggle's duration—more than three minutes—does not itself show excessive force; it demonstrates that the officers did not immediately succeed in overcoming Plaintiff's sustained resistance. *See Anglemeyer*, 92 F.4th at 188–89.

### 3. The Challenged Uses of Force

#### ***a. Collins' Takedown***

The initial takedown was reasonable. Plaintiff had already been told by Engel that he was detained. When Plaintiff later asked Collins whether he was under arrest, Collins explained that he was not then under arrest but was not free to leave. Plaintiff nevertheless continued walking. Collins followed, took Plaintiff's left arm, and announced, "You're under arrest now." Plaintiff pulled away and defiantly asserted that he was not under arrest as he resisted Collins' efforts. Only then did Collins bring Plaintiff to the sand. (Engel BWC at 2:36–2:45.)

Plaintiff emphasizes that he was walking rather than running and argues that Collins had just said he was not under arrest. But the same recording establishes that Collins simultaneously told him he was detained and not free to leave. Whether Plaintiff departed at a walk or a run, he was disregarding an express detention. And Collins announced the arrest before the takedown, not after it. The maneuver used no weapon and brought Plaintiff onto sand rather than a hard surface. In those circumstances, an officer need not allow a resisting arrestee to continue departing until his conduct becomes more dangerous. *See Graham*, 490 U.S. at 396–97; *see Barnes*, 605 U.S. at 78–81. No reasonable jury could find Collins' takedown disproportionate to the need to stop Plaintiff and effect the announced arrest.

#### ***b. Collins' and Engel's Ground Restraint***

Collins and Engel used their hands and body weight to prevent Plaintiff from rising and to bring his arms behind his back. The recordings show that they applied that force while Plaintiff was actively resisting. Their repeated commands— "give me your hands," "put your hands behind your back," and "stop resisting"—correspond to visible efforts by Plaintiff to keep his arms from them and lift himself from the sand. (Engel BWC at 2:40-3:34; D'Amico BWC at 2:43-4:46.) The fact that both officers participated does not establish that Plaintiff was already under control; the footage shows the opposite.

Plaintiff and his police-practices expert characterize Engel's movements as jerking, cranking, and twisting the right arm after it had been secured. (Pl.'s Opp. Br. at 14–16.) The moving footage does not support that factual premise. It shows Engel repositioning Plaintiff's right arm while Plaintiff continued moving his torso and withholding his other hand. Officers may use reasonable leverage to bring a resisting arrestee's hands together for handcuffing. *Cf. Kopec v. Tate*, 361 F.3d 772, 776–78 (3d Cir. 2004) (addressing unduly tight and prolonged handcuffing of a compliant arrestee). The recordings do not show Engel gratuitously twisting an already-controlled limb or continuing arm pressure after Plaintiff was secured.

***c. D'Amico's Upper-Body Control and OC Spray***

Plaintiff's principal allegations concern D'Amico. Plaintiff asserts that D'Amico immediately applied an air choke, later drove a weight-bearing knee into Plaintiff's neck for approximately two minutes, and twice sprayed an excessive quantity of OC spray from an unsafe distance. (Pl.'s Opp. Br. at 13–16, 39–40.) The recordings contradict the material factual predicates of those claims.

D'Amico arrived at the struggle after hearing that Plaintiff had struck and choked the children. The footage shows him reaching around Plaintiff's upper torso and using his hands to control Plaintiff's shoulder and upper body while Plaintiff moved beneath the officers. Although D'Amico's hand makes brief contact near Plaintiff's upper chest or lower neck as he obtains a grip, the moving sequence does not depict compression of Plaintiff's throat, the encirclement of his neck, or a sustained chokehold. Nor does it depict a knee placed on Plaintiff's neck. Viewed from the available angles, D'Amico's knee and shin bear on Plaintiff's shoulder and shoulder-blade area as D'Amico attempts to prevent him from rising. (D'Amico BWC at 2:43-4:46; Engel BWC at 3:24-6:07.) Plaintiff's still photographs capture moments of contact but cannot reasonably support a different conclusion when restored to the continuous sequence. *See Scott*, 550 U.S. at 378–80.

The OC spray was likewise proportionate. D'Amico did not deploy it when Plaintiff was standing, speaking with officers, or lying passively. He used it only after Collins and Engel had struggled to control Plaintiff's arms and while Plaintiff continued to push upward and resist handcuffing. Before spraying, D'Amico called, "mace out, mace out," allowing the other officers to anticipate the deployment. The footage depicts two closely spaced bursts directed toward Plaintiff's face; it does not support Plaintiff's characterization of an extended, punitive application. Plaintiff continued resisting afterward, and D'Amico did not continue spraying once the officers resumed manual control. (D'Amico BWC at 1:30–2:58.)

OC spray can constitute excessive force when used against a person who is secured or not resisting. *See Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006). But the constitutional question turns on the circumstances of its use, not on the agent alone. Here, D'Amico used a limited quantity to obtain compliance during active resistance after lesser physical efforts had failed. The warning, timing, brief duration, and cessation of the spray all demonstrate an effort to temper the force employed. *See Graham*, 490 U.S. at 396–97.

Plaintiff's expert opines that D'Amico violated departmental and state policies governing neck restraints and the recommended distance and duration for OC spray. (Pl.'s Opp. Br. at 13–16.) Those opinions depend in substantial part on factual descriptions that the recordings disprove. And an expert's conclusion that conduct was "objectively unreasonable" does not determine the governing legal question. *See Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Departmental or training standards may supply context, but they do not themselves define the Fourth Amendment's constitutional floor. *See Whren v. United States*, 517 U.S. 806, 815 (1996).

***d. Lloyd's Assistance***

Lloyd's personal involvement was limited. He entered the struggle when Plaintiff had obtained a grip on the handcuffs and briefly helped control Plaintiff's right arm and upper body

until Engel regained control. (Defs.' SUMF ¶ 28; Lloyd BWC at 0:58–1:18.) The recording does not show Lloyd striking Plaintiff, placing weight on his neck, or applying force after the handcuffs were secured. Plaintiff's expert describes Lloyd as maintaining upward pressure while Engel applied downward pressure to the arm. (Pl.'s Opp. Br. at 14, 16.) But even accepting that description to the extent consistent with the footage, the pressure was applied while Plaintiff was resisting and gripping the handcuffs. Brief assistance directed toward freeing the cuffs and securing the arm was objectively reasonable.

#### 4. Plaintiff's Injuries

The Court accepts for purposes of Defendants' motion that Plaintiff suffered a ruptured biceps tendon and the other injuries he attributes to the arrest. Injury is relevant to the Fourth Amendment analysis, but it does not by itself establish that the force producing it was excessive. *See Anglemeyer*, 92 F.4th at 188–89. The inquiry remains whether the officers' actions were objectively reasonable in the circumstances confronting them. *Graham*, 490 U.S. at 396–97.

Plaintiff's photographs of his neck may support an inference that incidental contact occurred briefly during the struggle, but they do not contradict footage showing there was no chokehold or sustained neck pressure. As to the biceps injury, Defendants' orthopedic expert attributes the rupture to the force generated by Plaintiff's resistance as officers attempted to place his arms behind his back (Anapolle Report at 8–9), however, the Court need not resolve medical causation. Even assuming that an officer's actions caused the tendon injury, the recordings show that the arm-control techniques were used to overcome active resistance and ceased when handcuffing was complete. A serious consequence does not transform otherwise proportionate force into a constitutional violation.

Considering the entire encounter and each challenged act, the relationship between the need for force and the amount used was reasonable. Plaintiff was suspected of recent violence, attempted to leave a lawful detention, pulled away when arrested, and actively resisted for several minutes.

The officers escalated from commands to hands-on control and then to a brief use of OC spray; they did not strike Plaintiff or use an impact weapon or Taser; and they stopped using force once he was secured. No reasonable jury could find that Collins, Engel, D'Amico, or Lloyd violated the Fourth Amendment.

**5. Qualified Immunity**

Qualified immunity independently protects an officer unless the plaintiff shows both a violation of a federal right and that the right was clearly established in the specific context confronting the officer. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). The Court may address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A clearly established right must be framed with sufficient specificity that every reasonable officer would understand that the conduct was unlawful. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (*per curiam*).

For the reasons already explained, Plaintiff has not shown a constitutional violation. Nor has he identified precedent that would have placed the unlawfulness of the challenged acts beyond debate in the circumstances confronting these officers. *See City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (*per curiam*). At the proper level of specificity, the questions are whether established law prohibited Collins from taking to the ground a suspect who walked away from an express detention and pulled free after arrest was announced; prohibited Collins, Engel, and Lloyd from using body weight and arm-control techniques while that suspect resisted handcuffing; or prohibited D'Amico from briefly using OC spray after manual efforts failed.

Plaintiff principally invokes decisions involving force against compliant or subdued persons. *Kopec* concerned excessively tight handcuffs left in place after a cooperative arrestee repeatedly complained of severe pain. 361 F.3d at 774, 777–78. *Couden* involved substantial force against a person who was not resisting or attempting to flee. 446 F.3d at 497. And *Jacobs* involved blows to an unarmed and compliant detainee. 8 F.4th at 195–96. Those decisions confirm the

general rule against gratuitous force, but they do not clearly establish that the measured techniques used here were unlawful against a person visibly and continuously resisting arrest. *See Rivas-Villegas*, 595 U.S. at 6–8 (explaining that precedent involving materially different restraint circumstances did not clearly establish the unlawfulness of the officer's conduct).

Nor would an asserted violation of a departmental policy, standing alone, defeat immunity. An officer does not lose qualified immunity merely because conduct may violate an administrative or training directive; the question is whether binding law clearly established a federal constitutional violation. *See Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984). Because no controlling authority placed the specific conduct here beyond debate as of September 11, 2021, the individual Defendants are entitled to qualified immunity independently of the Court's merits determination.

**B. Failure to Intervene**

An officer may be liable for failing to intervene when another officer violates a person's constitutional rights and the observing officer had a realistic and reasonable opportunity to prevent the violation. *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002); *El v. City of Pittsburgh*, 975 F.3d 327, 335–36 (3d Cir. 2020). The claim fails at the first requirement. Because the force used against Plaintiff was objectively reasonable, there was no constitutional violation for another officer to prevent. *See El*, 975 F.3d at 335–36. Defendants are entitled to summary judgment on Count Two, and Plaintiff's cross-motion on that count is denied.

The claim also fails for an independent reason. Plaintiff must produce evidence from which a jury could determine that a particular officer perceived unlawful force and had enough time and ability to stop it. *See id*. Plaintiff instead treats the officers' presence as sufficient. It is not. Collins and Engel were physically occupied with controlling Plaintiff's arms when D'Amico announced and deployed the brief OC bursts. Lloyd's intervention was itself brief and directed toward freeing the handcuffs from Plaintiff's grip. The claimed chokehold and neck restraint, moreover, did not

occur as Plaintiff describes. On this record, a jury could not find that any Defendant observed an unconstitutional act and possessed a realistic opportunity to prevent it.

### C. **Municipal Liability**

A municipality is not vicariously liable under § 1983 for its employees' conduct. *Monell*, 436 U.S. at 691–92. A plaintiff instead must identify a municipal policy or custom, attribute it to the municipality, and show that it caused the constitutional injury. *Forrest v. Parry*, 930 F.3d 93, 105–06 (3d Cir. 2019). A failure-to-train theory additionally requires deliberate indifference, ordinarily shown by a pattern of similar constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989); *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011).

Plaintiff's *Monell* claim fails because the individual officers committed no constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*). It also fails for lack of proof of an actionable policy, custom, or training deficiency. The undisputed record shows that Wildwood Crest maintained a written use-of-force policy, required relevant training, and had only one prior excessive-force complaint against D'Amico, which resulted in exoneration. (Defs.' SUMF ¶¶ 40–43.) Plaintiff identifies no pattern of comparable incidents and no evidence linking a municipal decision to the force used here. His reliance on this single encounter and the presence of supervisory officers amounts to *respondeat superior*, which *Monell* forbids. 436 U.S. at 691-93. Accordingly, the Court grants summary judgment for Wildwood Crest on Count Three.

Plaintiff's alternative theories do not alter that conclusion. He identifies no formal policy directing unconstitutional force. To the contrary, the record reflects a written use-of-force policy and regular training. (Defs.' SUMF ¶¶ 41–43.) A failure-to-train claim requires proof that the municipality's policymakers disregarded a known or obvious risk that deficient training would cause constitutional violations. *Connick*, 563 U.S. at 61–62. Plaintiff neither identifies a particular training deficiency nor connects one to any officer's conduct in this case. His expert's view that

individual officers departed from policy does not establish that the policy or training itself was constitutionally deficient.

Nor has Plaintiff shown a settled custom of permitting excessive force. The record identifies only one prior excessive-force complaint against D'Amico, and that matter ended in exoneration. (Defs.' SUMF ¶ 40.) Plaintiff offers no evidence that the prior event involved comparable conduct, that its investigation was inadequate, or that it placed municipal policymakers on notice of recurring constitutional violations. A single prior complaint, without proof of its substance or validity, does not establish the persistent and widespread practice required for municipal custom. *See Forrest*, 930 F.3d at 105–06.

Finally, Lloyd's presence does not establish policymaker ratification. Plaintiff relies in part on Lloyd's participation and his statement to D'Amico after the arrest that they had "talked about this before." (Pl.'s Opp. Br. at 45–47.) The remark does not identify what the two had discussed, much less show that Lloyd approved a known constitutional violation. And the incident itself supplies no violation to ratify. Without evidence of an unconstitutional municipal decision and a causal link to Plaintiff's injury, the presence of senior officers at a single arrest cannot support *Monell* liability.

### D. <u>New Jersey Civil Rights Act</u>

The NJCRA was modeled on § 1983, and courts interpret its substantive protections analogously to federal civil-rights law. *Tumpson v. Farina*, 218 N.J. 450, 474 (2014). New Jersey likewise applies the federal qualified-immunity standard to claims under the NJCRA. *Brown v. State*, 230 N.J. 84, 97–98 (2017). Plaintiff identifies no independent state-law basis that would alter the analysis. Accordingly, because the challenged force was reasonable and the individual Defendants are entitled to qualified immunity, and because the record establishes no basis for municipal liability, Defendants are entitled to summary judgment on Count Four.

### E. Plaintiff's Cross-Motion

Plaintiff seeks summary judgment on excessive force and failure to intervene, arguing that the recordings conclusively establish his account. (Pl.'s Opp. Br. at 38–40.) The Court disagrees. For the reasons stated above, the recordings establish that Plaintiff was informed of the detention and arrest, walked away and pulled from Collins, actively resisted handcuffing, was not subjected to a chokehold or knee pressure on his neck, and encountered force that ceased when he was secured. At minimum, viewing the evidence in Defendants' favor as the nonmovants on Plaintiff's application, Plaintiff cannot demonstrate that a reasonable jury would find a constitutional violation. *See Auto-Owners*, 835 F.3d at 402. Therefore, the Court denies Plaintiff's cross-motion for summary judgment.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 45) is **GRANTED**, and Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 53) is **DENIED**. An appropriate Order follows.

Dated: September 29, 2026

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE